**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

BRMED CAPITAL, LLC,

                    Plaintiff,           **MEMORANDUM & ORDER**

     v.                               1:18-cv-04333 (ST)

LEXINGTON INSURANCE COMPANY,

                    Defendants.
-----------------------------------------------------------X
**TISCIONE, United States Magistrate Judge:**

## INTRODUCTION

       This case involves a disagreement between the insurer and the insured over whether their insurance contract covers damage caused by a broken sprinkler pipe at the insured premises. The case turns on the interpretation of the term "water lines" within a protective safeguard condition in the policy. Both parties have moved for summary judgment. For the reasons enumerated below, I deny the Defendant's motion for summary judgment in its entirety and grant the Plaintiff's motion for summary judgment on liability under the insurance contract.

## BACKGROUND

### I.    Facts

On or about January 9, 2018, multiple sprinkler pipes from the fire protective system froze and burst at 5205-5207 Church Avenue in Brooklyn, New York. *See* Def. R. 56.1 Br., ¶1, ECF No. 54. Plaintiff, BRMed Capital, LLC, owned the Church Ave building, and Defendant, Lexington Insurance Company, provided vacant property insurance for the building at the time of the sprinkler failure. *See* Pl. Compl. ¶18, ECF No. 1; *Policy*, ECF No. 53-1. The burst

1

sprinkler pipes resulted in flood damage to the property. Pl. Compl. ¶18, ECF No. 1; Def. R. 56.1 Br., ¶1, ECF No. 54. The Plaintiff alleges the flood damage resulted in a loss of $1,359,012.50. Pl. Compl. ¶19, ECF No. 1. The cause of the freeze is disputed by the parties, with the Defendant arguing it was a result of insufficient efforts to heat the building on the part of the Plaintiff's agents and the Plaintiff arguing it was the result of an unusual extreme cold weather event. *See* Def. Br., 1, ECF No. 55; Pl. Br., 22, ECF No. 60. The Plaintiff claims the sprinkler system failure and resultant damage is covered under the Defendant's insurance policy up to the policy limit, while the Defendant claims that Plaintiff failed to comply with a condition within the policy, and that recovery is therefore barred.

### a.   The Insurance Contract

The insurance policy at issue went into effect August 18, 2017. *See* Policy, 14, ECF No. 53-1. The policy contained vacant property coverage which insured the building up to $1.2 million if certain conditions were met by the insured. *Id.* There are five sections of the insurance contract applicable to this action, Sections A, E(2)(g), E(4)(c), I, and Protective Safeguard P-9.

Section A describes the overarching coverage of the policy. It says, "[Defendant] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Policy, 16, § A, ECF No. 53-1. "Covered Property" under the policy includes the Plaintiff's building, which is listed under the policy as 5205-5207 Church Ave. *Id.* at 15. A "Covered Cause of Loss" is defined in the insurance policy as "risks of direct physical loss unless that loss is: 1. Excluded in Section E…or 2. Limited in Section F., Limitations…" *Id.* at 18, § D. Though direct physical loss or the risks thereof are not defined, Defendant does not contest that sprinkler leakage and the resulting damage is a direct physical loss.

2

Per Section A, then, the loss at issue here would be covered by the policy, unless it is subject to some exclusion or limitation.  Section E(2)(g) is one potentially applicable exclusion. It says that the Defendant "will not pay for loss or damage caused by or resulting from…water…that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing unless: (1) you do your best to maintain heat in the building or structure; or (2) you drain the equipment and shut off the water supply if heat is not maintained." *Id.* at 21, §E(2)(g).  By the plain language of E(2)(g), fire protective systems are not subject to that exclusion.  Thus, because the sprinkler pipes at issue were part of the building's fire protective system, the exclusion does not apply to Plaintiff's loss.

Another potentially applicable exclusion is Section (E)(4)(c).  Section (E)(4) says, "[Defendant] will not pay for loss or damage caused by or resulting from the following, if such excluded cause of loss is shown in the Declarations, or by endorsement hereto…"  One of the causes, listed in subsection (c), is, "Sprinkler leakage, meaning leakage or discharge of any substance from an 'Automatic Sprinkler System…'" *Id.*  By its terms, it appears this exclusion would exclude the loss at issue from coverage but only "if such excluded loss is shown in the Declarations, or by endorsement hereto…" *Id.*

The "Extension of Supplemental Declarations" page of the insurance policy, then, controls exclusion (E)(4)(c).  It includes certain specific protective safeguards (known collectively as the "P-9" safeguards).  Among those safeguards is the requirement that: "Heat must be maintained within the premises at a temperature of no less than 55 degrees Fahrenheit or water lines must be completely drained during the policy period." *Id.* at 14.  Nowhere within the P-9 safeguards are the words "sprinkler leakage" or "automatic sprinkler system" mentioned. Another safeguard the insurer could have chosen to include in the supplemental declarations but

3

did not is a "P-1" protective safeguard which controls "Automatic Sprinklers." *Id.*

Section I of the policy also is potentially applicable here, not as an exclusion or limitation on coverage, but as a condition on the insured or a warranty. It says, "As a condition of this insurance, you are required to maintain the protective devices or services listed below, if such safeguard is shown as applicable in the Declarations or by endorsement hereto: (1) Automatic Sprinkler System…(4) Heat must be maintained within the premises and monitored at minimum once per day, at a temperature of no less than 55 degrees Fahrenheit…We will not pay for loss or damage to Covered Property if, prior to the loss or damage, you knew of any suspension or impairment in any protective safeguard listed in the Declarations, and failed to notify us of such suspension or impairment." *Id.* at 23.  It appears based on the text of this requirement, that the insured would be required to maintain an automatic sprinkler system and heat at 55 degrees but only as listed in the declarations.  P-9 is the only applicable provision in the declarations and requires that: "Heat must be maintained within the premises at a temperature of no less than 55 degrees Fahrenheit or water lines must be completely drained during the policy period." *Id.* at 14. Therefore, Section I only makes those items listed in P-9 conditions upon the insured.

As should become apparent after the brief summation of the policy terms above, this contract is far from a model of draftsmanship.  In fact, the terms are so difficult to discern that, at times, even the Defendant's agents had trouble interpreting it.  In the Defendant's property claim examiner's letter disclaiming coverage, dated May 31, 2018, as reasons for disclaiming coverage she not only referenced the P-9 conditions but also the Section I conditions that do not appear in P-9 and are therefore inoperative. *See* Moniz Letter*,* ECF No. 53-7.  The report prepared by the Defendant's claims investigator, appears to have made the same mistake. *See* York Report, 6, ECF No. 49-27.  As a general matter, insurance contracts should be clear enough so that both

4

parties may at least reasonably discern what their obligations are under the contract and what coverages are and are not provided.

It appears from the terms of the contract that the P-9 conditions govern this action.  Fire protective systems, which would include a sprinkler system, are not part of the E(2)(g) exclusion. The E(4)(c) exclusion only applies insofar as its terms are stated in the Declarations, which only applicably include the P-9 terms.  The Section I conditions are limited to those listed in P-9.  For these reasons, the parties rightly anchor their arguments in the language of P-9, that both the condition of coverage and exclusionary clause required that, "Heat must be maintained within the premises at a temperature of no less than 55 degrees Fahrenheit or water lines must be completely drained during the policy period." Policy, 14, ECF No. 53-1.

### b.  Efforts to Comply

On this record, it is unclear whether heat was maintained at a level of 55 degrees or higher. Based on gas bills, it appears the gas meter for the building was "unlocked", meaning gas began to be supplied to the building, on February 13, 2018. *See* Nat. Grid Bill, ECF No. 49-21. That would mean the gas heating system was not in operation at the time of the sprinkler failure. However, Plaintiff was heating the building with three electrical mini-split heat pumps, one electric baseboard, and electric space heaters leading up the failure. *See* Pl. R. 56.1 Br., ¶¶ 6, ECF No. 59.  It is unclear whether that method of heating was enough to maintain the building at 55 degrees.  The Plaintiff's building manager testified that he would check the six thermostats in the building weekly to ensure they were set to 60 degrees. *See* Lameh Dep., 49, 54-55, 70, ECF No. 49-28.  He also claimed he took air temperature measurements with a handheld thermometer on some of those visits, though no records of those measurements were ever produced. *Id.* at 104.

Nowhere in the record does it appear Defendant's agents ever took temperature measurements inside the building.

Under the P-9 protective safeguard, if Plaintiff did not maintain a temperature of 55 degrees in the building, it could still comply with the policy if it drained all the "water lines." Policy, 14, ECF No. 53-1. Plaintiff's property manager claimed he winterized the building at some point in 2016, which involved him closing off the water valves in the basement and emptying the toilets and sinks. Lameh Dep., 91, ECF No. 49-28. However, he did not drain the sprinkler pipes, which remained "wet" or "charged" with water when the failure occurred. Eshagoff Dep., 75, ECF No. 57-5.

## II.    Summary Judgment Motions

At this time, both parties have moved for summary judgment. The Defendant argues the term "water lines" within P-9 includes any pipe which water moves through, including sprinkler lines. Its argument is that because the Plaintiff did not meet what it deems the Plaintiff's absolute obligation to keep all parts of the building at 55 degrees or drain its sprinkler lines, Defendant is entitled to summary judgment on against liability under the insurance policy. *See* Def. Br., 1, ECF No. 55. Meanwhile, Plaintiff argues "water lines" within P-9 does not include sprinkler lines, which are instead part of the fire protective system of the building, separate and apart from the plumbing system actually referred to as "water lines." Therefore, Plaintiff's argument goes, winterization efforts undertaken by the Plaintiff met, at minimum, the P-9 requirement of draining the "water lines," making the temperature maintenance provision superfluous. However, Plaintiff also argues in the alternative that the term "maintain" within the temperature condition is ambiguous, and Plaintiff's efforts prior to the sprinkler failure could be construed as "maintaining" the required 55 degrees in the building. *See* Pl. Br., 1-2, ECF No. 60.

## LEGAL STANDARD

### I.  Summary Judgment Standard

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is material if the fact "might affect the outcome of the suit under the governing law…" *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute exists as to a material fact when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

On motions for summary judgment, the moving party bears the initial burden of establishing the absence of a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party meets that burden, the non-moving party must then show there is a genuine dispute for trial. *Id.*  The burdens on both parties as to the underlying elements are aligned as they would be at trial. *Id.* at 254.

When considering a motion for summary judgment, the Court must construe "all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  On cross-motions for summary judgment, the Court must consider each motion independently of the other…" *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

### II.  Ambiguity in Contracts

The threshold question in a dispute over the meaning of a contract is whether the contract is ambiguous. *Hastings Dev., LLC v. Evanston Ins. Co.*, 701 Fed. Appx. 40, 69 (2d Cir. 2017)

(quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir 2011)). Language in a contract is ambiguous if "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* The question of ambiguity in a contract is to be decided by the Court. *Mellon Bank, N.A. v. United Bank Corp.,* 31 F.3d 113, 115 (2d Cir. 1194) (citing *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir. 1993)). If language in a contract is not ambiguous, we must give the words "their plain and ordinary meaning." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir. 2011). If the language is ambiguous, the court then may consider extrinsic evidence to determine the parties' intent at the formation of the contract. *Hastings,* 401 Fed. Appx. at 42 (citing *Olin Corp. v. Am. Home Assur. Co.,* 704 F.3d 89, 99 (2d Cir. 2012)).

## III.   New York Law

This Court hears this contract law case sitting in diversity jurisdiction. As such, the substantive law to be applied is state law. *Erie R.R. v. Tompkins,* 304 U.S. 64 (1938). This Court sits in New York, so in deciding which state law should apply, it looks to New York's conflicts law. *See GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377 (2d Cir. 2006). That law commands the Court first look to apply the choice of law clause in the insurance contract. *AEI Life, LLC v. Lincoln Ben. Life Co.,* 225 F. Supp. 3d 136, 140 (E.D.N.Y. 2016). No such clause exists in this contract, so, if there were a conflict of law question presented, New York law would command a "significant relationship" test. *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309 (N.Y. 1994). Plaintiff argues that New York law applies, and Defendant cites to New York law in its brief. With seeming agreement among the parties that New York law applies, and with no reason for the Court to question New York has

the most significant relationship to this case, further analysis of conflict of laws is unnecessary, and the Court will apply New York State law.

Under New York contract and insurance law, an insurer is "entitled to have its contract of insurance enforced in accordance with its provisions and without a construction contrary to its express terms." *Bretton v. Mutual of Omaha Ins. Co.,* 110 N.Y.S.2d 760, 763 (1985).  However, "any ambiguities are construed in favor of coverage." *Randolph v. Nationwide Mut. Fire Ins. Co.,* 662 N.Y.S.2d 650, 651 (1997); *see also Patriarch Partner LLC v. Axis Ins. Co.,* 758 Fed. Appx. 14, 20 (2d Cir. 2018) ("Any ambiguities are to be construed in favor of the insured.").

In New York, "where an insurer attempts to limit liability by use of an ambiguously worded term which is subject to more than one reasonable construction, the courts will construe it strictly against the insurer." *Sperling v. Great Amer. Ind. Co.*, 7 N.Y.2d 442, 447 (1960). Insurance coverage exclusions, in particular, "must be stated in 'clear and unmistakable' language and are subject to a 'strict and narrow construction.'" *Patriarch Partners*, 757 Fed. Appx. at 20 (quoting *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984)).  As the Second Circuit has noted, New York law "governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds. Policy exclusions are enforced only when they 'have a definite and precise meaning, unattended by danger of misconception…and concerning which there is no reasonable basis for a difference of opinion.'" *Beazley Ins. Co. v. Ace Am. Ins. Co.*, 880 F.3d 64, 68-69 (2d Cir. 2018) (quoting *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307 (2009)).

It is not lost on the Court or the parties in their briefs that New York's substantive law resolving insurance contract ambiguities in favor of the insured is in some tension with the federal summary judgment standard on a motion by Plaintiff, in which the Court is required to

9

construe "all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson* 680 F.3d at 236.

The Hon. Jack Weinstein addressed this exact tension at some length in his thoughtful and comprehensive opinion in *Uniroyal, Inc. v. Home Ins. Co*. In it, he wrote:

> "The current rule on summary judgment has special importance for insurance coverage disputes because of some prior confusion over the resolution of 'ambiguities' in an insurance policy. Two aspects of 'ambiguity' appear to be in conflict: ambiguity in an insurance contract that may render summary judgment improper as a matter of federal civil procedure; and ambiguity in an insurance contract that must be construed by the court as a matter of substantive state contract law. The former, proceduralist view, stresses that ambiguity inherently necessitates a full presentation of extrinsic evidence for the factfinder's evaluation. The latter, substantive view, rests on the assumption that, as a matter of substantive state insurance contract law, ambiguities in an insurance policy are to be construed by the court against the insurer. A motion for summary judgment appears to invoke these inconsistent rules simultaneously…The proper resolution under federal procedure and New York law is that summary judgment is proper on an ambiguous insurance policy when, after having allows full discovery and found no valuable extrinsic evidence of the parties' intent, the court applies as a last resort the state law presumption construing the policy against the insurer."

*Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1372-73 (E.D.N.Y. 1988).

This is precisely the current approach in the Second Circuit. In insurance law questions governed by New York substantive law, the Second Circuit has held a Court should: (1) determine if the contract is ambiguous; (2) if the Court concludes it is ambiguous, consider extrinsic evidence and attempt to ascertain the parties' intent at the formation of the contract; and (3) if the extrinsic evidence fails to establish the parties' intent, apply other rules of contract interpretation including New York's rule of resolving ambiguities in favor of the insured. *See Hastings Dev., LLC v. Evanston Ins. Co.*, 701 Fed. Appx. 40, 42-43 (2d Cir. 2017).  The Second Circuit further notes that this third step, application of New York's rule of *contra proferentem*,

"gains added force when ambiguities are found in an exclusionary clause." *Haber v. St. Paul Guardian Ins. Co.,* 137 F.3d 691, 698 (2d Cir. 1998).

## DISCUSSION

At the outset, it is important to note that the condition at issue, contained within Protective Safeguard P-9, contains two separate clauses, compliance with either one of which will satisfy the condition. The insured had to either maintain the heat at a temperature of no less than 55 degrees within the premises *or* completely drain the water lines.  Per Section I, if the insured knew of an impairment where both clauses had not been complied with and did not notify the insurer, the insurer could disclaim coverage.

Both parties agree that the Plaintiff drained the property's potable water lines but did not drain the property's sprinkler lines.  See Def. R. 56.1 Br. ¶ 11, ECF No. 54; P. R. 56.1 Br. ¶ 11, ECF No. 59.  Therefore, if "water lines" as used in the contract is not inclusive of sprinkler lines, the Court need not consider the question of whether the Plaintiff complied with the clause of the condition dealing with maintenance of temperature.  Because it may avoid consideration of an issue unnecessary to dispose of this case, I will first consider the narrow issue of the definition of the term "water lines" within the contract.

## I.     The Term "Water Lines" in Protective Safeguard P-9 Is Ambiguous

### a.   Plaintiff Did Not Meet Its Burden to Show "Water Lines" Unambiguously Excluded Sprinkler Lines

The first step of my analysis requires me to determine, based only on the text of the contract itself, whether the portion of the contract at issue, the P-9 protective safeguard, is ambiguous. Language in a contract should be given its "plain and ordinary meaning" but is ambiguous if "it is capable of more than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire integrated agreement." *10 Ellicott Square* 634 F.3d at 119; *Hastings Dev.,* 701 Fed. Appx. at 69.

P-9, potentially operative through either the exclusion in Section E(4)(c) or the conditions of insurance in Section I, says, "Heat must be maintained within the premises at a temperature of no less than 55 degrees Fahrenheit or water lines must be completely drained during the policy period." Policy*,* 14. Plaintiff argues "water lines" is an unambiguous term that does not include sprinkler pipes. Defendant, in response, argues that the "plain and ordinary" meaning of water lines is any pipe that water runs through, inclusive of sprinkler pipes. The dispute is material because if "water lines" is inclusive of a sprinkler pipe, then the exclusion/condition would appear to apply, exempting the Defendant from coverage if the Plaintiff did not maintain a temperature of 55 degrees within the premises.

The insurance contract itself does not define "water lines." When determining the "plain and ordinary" meaning of a contract term, "it is common practice for the courts of this state to refer to the dictionary…" *10 Ellicot Square,* 634 F.3d at 120 (quoting *Essex Ins. Co. v. Laruccia Constr., Inc.,* 898 N.Y.S.2d 558, 559 (2010)). Plaintiff does not cite any dictionary definitions that support their construction of the term water line, instead relying upon the context of the term within the contract.

Defendant, in its brief, provides dictionary definitions for water line. It notes that "water line" is defined in the Random House Unabridged Dictionary as "a pipe, hose, tube, or other line for conveying water." Def. Br., 11, ECF No. 55. It also notes that the Webster's New World College Dictionary defines "waterline" as "a pipe, tube, or other line connected to a source of water." Def. R. 56.1 Br. ¶18, ECF No. 54. The Oxford English Dictionary is similar defining "water line" in its only applicable definition as, "A water pipe; a piped water supply." The

sprinkler pipe that broke certainly contained water and was connected to a water source, based on Plaintiff's own expert's testimony. *See* Vigilante Dep., 33, ECF No. 57-11.  Based on these definitions alone, Plaintiff cannot carry its burden on summary judgment of showing that no objectively reasonable person could define "water line" as inclusive of a sprinkler pipe.

As such, Plaintiff has not sustained its burden to show "water lines" as used in the contract unambiguously excluded sprinkler lines.

### b. Defendant Did Not Meet Its Burden to Show "Water Lines" Unambiguously Included Sprinkler Lines

However, while the dictionary definitions establish that Defendant's definition of "water lines" is one reasonable definition, it does not establish it is the *only* reasonable definition.  The standard for ambiguity depends upon the meaning of the word as perceived by "a reasonably intelligent person *who has examined the context of the entire integrated agreement*." *Hastings*, 701 Fed. Appx. at 42.  Upon examination, the contract itself tends to support Plaintiff's argument, that "water lines," as used in the contract, was not inclusive of sprinkler lines.

The term "water lines" is not only not defined in the insurance policy, it is never used at any other point in the contract aside from its use in the P-9 safeguard.  Because there is nothing in the contract specifically defining "water lines," Defendant contends that the Court look no further than the dictionary definitions in determining the meaning of "water lines."  However, in determining whether a term within a contract is ambiguous, it is well established in the Second Circuit that a Court must "examine[] the context of the entire integrated agreement," "construe the policy in a way that affords a fair meaning to *all* the language employed by the parties in the contract…," and "take the fact that a given interpretation would render a provision superfluous into account…" *See Lockheed Martin Corp.* 639 F.3d at 69; *Inc. Vill. Of Old Westbury v. Am. Alternative Ins. Corp.*, 710 Fed. Appx. 504, 505 (2d Cir. 2018) (quoting *Consol. Edison Co. of*

*N.Y. v. Allstate Ins. Co.*, 98 N.Y. 2d 208, 221-22 (2002) [emphasis added]; *CP III Rincon Towers, Inc. v. Cohen*, 666 Fed. Appx. 46, 52 (2d Cir. 2016).

Though "water lines" is not defined nor mentioned in the contract aside from in the P-9 safeguard, the term "automatic sprinkler system" is not only defined but used throughout the contract. An automatic sprinkler system is defined in the contract as, "Any automatic fire protective or extinguishing system, including connected (1) sprinklers and discharge nozzles; (2) ducts, pipes, valves and fittings…" Policy, 29, § N(1), ECF No. 53-1.  It is clear then, from the text of the contract, that an "automatic sprinkler system" includes sprinkler pipes including the ones that froze and failed in this case.  That is made even clearer in the Section E(4)(c) which excludes, if such loss is shown in the declarations, "sprinkler leakage, meaning leakage or discharge of any substance from an 'Automatic Sprinkler System…'" *Id.* at 21, §E(4)(c).

The term "fire protective system" is defined in the contract as inclusive of the automatic sprinkler systems which include the sprinkler pipes. *See* Policy, 29, § N(1)(b).  The term "fire protective system" is used in another portion of the contract, where it is differentiated from other types of water pipes.  In Section E(2)(g), the contract excludes from coverage "water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (*except fire protective systems*) caused by or resulting from freezing unless [certain conditions are met]…" *Id.* at 21, § E(2)(g) [emphasis added].

Given that the terms "automatic sprinkler system" and "fire protective system" are used in the rest of the contract to refer to sprinkler pipes, it hurts Defendant's argument that neither of these terms were used in P-9 if the condition there was meant to encompass the draining of sprinkler pipes.  This is compounded by the fact that one of the options for protective safeguards that could have been included in the supplemental declarations was "P-1 = Automatic

14

Sprinklers," yet neither that safeguard nor that term was used on that page of the policy; instead, the language of P-9 was used. *See id.* at 14.  Additionally, the fact that the contract specifically differentiates in another section between "water…that leaks or flows from plumbing" and "fire protective systems," even if that section is not operatively controlling, provides context which could lead a reasonably intelligent person to believe that the two were treated separately in the policy, and that, if the contract were to refer to the sprinkler pipes, it would do so by the terms "automatic sprinkler system" or "fire protective system."

The Defendant also cites case law in support of its proposition that "water lines" unambiguously includes sprinkler pipes.  It claims that New York courts have previously conclusively defined the term "water line" to include sprinkler pipes. I am not convinced the case law is so clear. *Matter of Aranda v. New York City Dept. of Bldgs.*, which Defendant cites to, seems to hurt rather than help its case. *See Aranda,* 2011 N.Y. Misc. LEXIS 4925 (Sup. Ct. N.Y. Cnty. 2011).  In that case, when the state court wrote regarding the "building's domestic water line rather than a dedicated water line for the exclusive use of the sprinkler system" it was referring to the domestic water lines that run up to a building and feed the interior pipes, not the interior sprinkler pipes themselves.  In fact, the totality of the opinion makes clear there are stark differences between plumbing systems and fire suppression systems and says, in the next sentence after that cited by Defendant, "Sprinkler system installations under fire suppression permits, however, use dedicated lines and require the licensee to…determine the fitting friction and the furthest sprinkler head that must be activated from the *sprinkler line.*" *Aranda,* 2011 N.Y. Misc. LEXIS 4925 at *6 [emphasis added].

*Ocean Walk Ltd. v. Certain Underwriters at Lloyd's of London*, which Defendant also cites to, is similar.  When this Court wrote, "The insured was under suspicion both because of the

nature of the fire and the fact that the outside water line which fed the water sprinklers had been turned off," it was referring to the domestic water line that ran to the building, not to any interior plumbing or sprinkler pipes like those at issue here. *See Ocean Walk*, 2005 WL 8160993, 2005 U.S. Dist. LEXIS 51517, *25, fn 3 (E.D.N.Y. 2005).  Having reviewed the remainder of the cases Defendant cites to, I could find no New York court that has authoritatively defined water lines to encompass sprinkler lines.

Defendant also cites, in its reply brief, to case law allegedly supporting its conclusion that "all courts that have examined policies with provisions similar to those contained in the Policy have held that the policies preclude coverage and are unambiguous." Def. Rep. Br., 1, ECF No. 61.  Of the two New York cases Defendant cites for this proposition, however, both deal with interpretations of provisions solely regarding maintenance of heat.  While that would be a material issue, it is only material *if* the Court finds that "water lines" is inclusive of sprinkler pipes. Because the condition at issue here gives the insured the option to *either* maintain heat or drain water lines, should the Court find that "water lines" was not inclusive of sprinkler pipes, then the Plaintiff's uncontradicted evidence that it complied by draining its plumbing would be enough to sustain summary judgment on liability, rendering the dispute over the temperature clause irrelevant.

It is certainly possible, as Defendant contends, that "water lines" was a categorical term meant to encompass both the automatic sprinkler system and the plumbing pipes.  I credit Defendant's argument that the purpose of the clause was to prevent freezing, otherwise there is no reason to also include the temperature requirement as an alternative to the draining of water lines in P-9.  However, based on the rest of the contract, it would be eminently reasonable to

believe that if the P-9 safeguards were meant to apply to sprinkler lines, they would have been referred to in the same way they were referred to the entirety of the remainder of the contract.

Thus, I find that Defendant did not meet its burden on summary judgment to show the term "water lines" in P-9 unambiguously included sprinkler lines.

I further find the term, for the reasons specified above, ambiguous.

## II.    The External Evidence Provided Does Not Resolve the Parties' Intent in Formation of the Contract

### a.    Plaintiff Did Not Meet Its Burden to Show, Based on All the Evidence, That That Parties Intended "Water Lines" To Exclude Sprinkler Lines At the Time of Contracting

As the term "water lines" is ambiguous when examined in the context of the entirety of the contract, I now turn to the extrinsic evidence in the record, to determine if it shows the parties' intent at the time of contracting. Both sides have, at this point, completed extensive discovery.

Plaintiff points to Nicole Knight's deposition as evidence that is helpful on this point. Ms. Knight was a supervisor for the corporate underwriter, called Distinguished Programs, that worked on the policy at issue. *See* Knight Dep., ECF No. 29-31. Per her deposition, the job of the underwriter company is to review applications for insurance policies for risk and, should they fall within an acceptable risk, to approve them to the insurance company for coverage. *See generally id.*

Ms. Knight testified that when the application for coverage came in from the broker, the information sent to the underwriter was that the building did not have a sprinkler system. *Id.* at 57-58. She says, as a result the policy was approved by Distinguished for a building without a sprinkler system:

"Q: Okay, so the policy that was ultimately issued in this case, if it's based upon a submission, that says there's no sprinkler system, would have been written for a building without a sprinkler system? Is that correct?
A: Correct."

*Id.* at 61.

However, later in her deposition, she says that it was Lexington, not Distinguished, which wrote the policy terms:

"Q: So Lexington actually creates the contract terms?
A: Correct."

*Id.* at 64.

Lexington maintains in this action that it did intend to include sprinkler lines in the term "water lines" in the P-9 safeguard.  While Ms. Knight's testimony may be evidence undercutting that assertion, assuming facts most favorable to the opposing party, Ms. Knight's testimony does not confirm that Lexington did not have a different interpretation of what they were insuring than Distinguished did at the time of approval.  And, since Ms. Knight does not appear to have written the P-9 policy, her opining later on in her deposition that water lines could have multiple meanings, does not inform the Court as to the parties' intent at the time of contracting.

Additionally, Plaintiff relies upon the testimony of its expert, Sal Vigilante.  Mr. Vigilante is a dual-licensed master plumber and fire suppression contractor who was deposed and supplied an affidavit in this action.  In his testimony, he states that the term "water line," in its ordinary usage, is limited to pipes that carry potable water. *See* Vigilante Dep., 61-63, ECF No. 57-11; Vigilante Aff. ¶ 8, ECF No. 58.  He also notes the distinctions between water lines and sprinkler pipes: that they are made of different materials and that they are governed by different New York State codes. *Vigilante Aff,* ¶ 4-5, ECF No. 58.  Mr. Vigilante also states that his customary practice in his business, when asked by a property owner to turn off the water lines

at a property, is not to turn off the sprinkler lines unless such service were specifically requested in addition. *Id.* at ¶ 5-6.  Mr. Vigilante's testimony is certainly useful for understanding what might have been meant by water lines at the time of contracting, but on summary judgment, it is not enough for the Court to find no reasonable jury could believe that Lexington believed the term to encompass sprinkler lines at the time of contracting.

Perhaps the most telling evidence of at least the Plaintiff's intent in the formation of the contract is the testimony of Raymond Eshagoff, a member of the Plaintiff, BRMed.  When asked what his understanding of the water lines condition, he said "…we complied with [it] because we drained the water lines in the building…I routinely deal with plumbers and sprinkler companies, and whenever we refer to a plumbing line, it is referred to as a domestic water line; and whenever we refer to a sprinkler line, it is referred to as a sprinkler line. It is never referred to as a water line." Eshagoff Dep., 185, ECF No. 49-12.  However, though this is Mr. Eshagoff's position now, it is not a commentary on the Plaintiff's intent at the time of contracting.  When asked about that, Mr. Eshagoff could not recall carefully reading the P-9 condition prior to the document being signed. *See id.* at 194.

Thus, the external evidence on this record is insufficient for a finding that the parties' intended "water lines" to exclude sprinkler pipes at the time of contracting.

> **b. Defendant Did Not Meet Its Burden To Show, Based on All the Evidence, That That Parties Intended "Water Lines" To Include Sprinkler Lines At the Time of Contracting**

Defendant claimed in its summary judgment motion that extrinsic evidence showed both parties understood the phrase "water lines" to encompass sprinkler pipes at the time of contracting, but similarly cannot carry its burden on summary judgment.

In support of its contention, Defendant argues "a reasonable insured owner of a vacant property would understand that P-9 was meant to prevent all pipes with water in them from freezing." Additionally, Defendant points out Plaintiff could have complied with the condition, by noting deposition testimony that shows Plaintiff was aware of a code-compliant means to drain the sprinkler lines.

The Defendant is correct that it is clear from the text of the portion of P-9 at issue that its purpose was to prevent freezing of pipes. It is for this reason the entirety of the condition contains a choice between two interrelated things: either maintain the premises at a certain temperature or drain the water lines. But just because the Defendant's purpose in including the condition was to prevent pipes from freezing, and that purpose was clear from the text of the provision, that does not mean a reasonable insured would have understood at the time of contracting that the drainage clause included sprinkler pipes. Beyond the context provided by the rest of the contact and detailed above, there are additional reasons why a reasonable insured owner of vacant property might not believe the insurer intended to have it drain the sprinkler lines to comply with that portion of the P-9 condition.

Plaintiff's agent has testified that, to attempt to heat the building, he brought space heaters inside. Lameh Dep., 60-63, ECF No. 49-28. These space heaters were brought in to supplement already existing electrical heating which was on at the time of the sprinkler pipes bursting. Eshagoff Dep., 128-150, ECF No. 49-12. A sprinkler system is designed to extinguish a fire, the particular kind of hazard that heating systems like the ones in use by the Plaintiff present. It is easy to see how it would seem counterintuitive for a reasonable Plaintiff to believe the insurer would want the building exposed to increased fire risk. A reasonable plaintiff may

have believed that, in calculating fire risk against pipe-bursting risk, the Defendant decided it was best to only require the drainage of the plumbing lines, but not the sprinkler lines.

While Defendant argues that the New York City Fire Code provides for other means of protecting a building than charged sprinklers, just because the Code provides for such eventualities does not mean that that Plaintiff understood this one clause to require such eventualities at the time of contracting.  Two alternatives were available to the Plaintiff, should it have drained the sprinkler lines. The first would have been to place a fire watch on the building, which the New York City Fire Code defines as hiring safety personnel, known as fire guards, to "identify[] and control[] fire hazards, including detecting early signs of fire, raising an alarm of fire, notifying the [Fire Department], and performing…other fire safety duties." NYC FC §202.1. Plaintiff would be required to hire "a sufficient number of fire guards…such that each floor or area in which the fire protection system is out of service is patrolled at least once an hour. The area patrolled by each fire guard shall not exceed more than 50,000 square feet." NYC FC §901.7.2.3.

The second alternative for Plaintiff, according to Defendant, would have been to convert the sprinkler line to a "dry" sprinkler system instead of a "wet" sprinkler system.  This would mean instead of the water residing in the sprinkler pipes ready to be deployed, the pipes would remain dry until activation of the system at which point the sprinkler pipes would fill with water. As Sal Vigilante, the Plaintiff's expert witness put it, converting the building's sprinkler system from wet to dry would be "cost prohibitive and it would take an enormous amount of time. It would be a tremendous burden for the property owner." Vigilante Dep., 94; ECF No. 57-11.  He further stated in his deposition that dry sprinkler systems are "intended for parking garages" and are "complicated and…maintenance intensive…" *Id.* at 135.  He further testified that in the

thousands of commercial buildings he has observed, he has seen only one with a dry system. *Id.* at 136.

It seems unreasonable to expect, based on the language of the contract which includes no language regarding a fire watch or conversion to a dry system, an ordinary building owner to understand that, should it fail to maintain a temperature of 55 degrees in the premises, the only way to remain compliant would be to drain the sprinkler systems and hire a fire watch or totally convert the sprinkler system to a dry one.  It is such an extreme remedy that, if that is truly what Defendant intended with the P-9 safeguard, a reasonable insured would expect such alternatives to be specified in the contract.  It also seems that the reading Defendant urges would impose such a "tremendous burden" on an insured choosing to maintain the premises at less than 55 degrees, that it would make P-9, in effect, a false choice.  If what Defendant truly wanted was just for the building to remain at a minimum of 55 degrees, it should have made that alone the safeguard, instead of the language that is included in P-9.

Defendant also cites NFPA 25 Section 5.4.2.2, incorporated into the New York City Fire Code, which says, "Refrigerated spaces or other areas within the building interior where temperatures are maintained at or below 40°F (4.4°C) shall not be permitted to be left wet." NFPA 25 §5.4.2.2.  But is unclear why this supports Defendant's assertion that Plaintiff understood P-9 to mean if the building was maintained below 55°F, the sprinkler lines must be drained.

For the reasons above, despite Defendant's assertions otherwise, there remains a genuine dispute, after examining the extrinsic evidence, as to whether both parties understood "water lines" in the P-9 safeguard to be inclusive of sprinkler lines.

III.    **Given All the Evidence, Under New York Substantive Law, Plaintiff Is Granted Summary Judgment on Liability**

Given that the phrase "water lines" as used in the contract is ambiguous and the extrinsic evidence does not resolve the question of what the parties understood it to mean at the time of contracting, summary judgment would generally not be appropriate. However, in this diversity state law action, we apply New York State law. New York's doctrine of *contra proferentem*, combined with the evidence in this case, satisfies Plaintiff's summary judgment burden.

Under New York law, "Where an in insurer attempts to limit liability by use of an ambiguously worded term which is subject to more than one reasonable construction, the courts will construe it strictly against the insurer." *Randolph v. Nationwide Mut. Fire Ins. Co.,* 662 N.Y.S.2d 650, 651 (1997). "Any such exclusions or exceptions from policy coverage must be specified and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." *Beazley Ins. Co. v. Ace Am. Ins. Co.*, 880 F.3d 64, 69 (2d Cir. 2018) (quoting *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.,* 12 N.Y.3d 302, 307 (2009)). This standard boils down to this: Under New York law, if the Defendant drafted an insurance contract, as it did here, "where the plain language of a policy permits more than one reasonable reading, a court must adopt the reading upholding coverage." *VAM Check Cashing Corp. v. Fed. Ins. Co.,* 699 F.3d 727, 732 (2d Cir. 2012).

I believe Plaintiff has satisfied its burden of showing no reasonable jury could say its reading of this policy is unreasonable. The term "water lines" is not defined anywhere in the contract.  Whenever in the rest of the contract, the parties referred to the sprinkler lines, it was done with the terms "fire protective systems" or "automatic sprinkler system," not "water lines." Other provisions in the contract differentiated between the plumbing lines and the sprinkler lines.

Defendant Lexington specifically chose not include the "'P-1' Automatic Sprinklers" protective safeguard in the supplemental declarations.  Plaintiff's expert who is licensed as both a master plumber and a fire suppression contractor testified that in his experience, "water lines" has referred to plumbing lines, and that the draining of a sprinkler system would be highly uncommon.  Draining of the sprinkler line would have put Plaintiff's building at risk for fire or fire code citation unless arduous and costly steps were taken, none of which were spelled out in the contract.  And the strictest and narrowest construction of the term "water lines," is that which Plaintiff urges, not the more inclusive definition that Defendant urges. All of this supports a finding of reasonableness for Plaintiff's interpretation of the P-9 safeguard and, in turn, mandates summary judgment on liability for the Plaintiff.

Because Plaintiff was required by P-9 to either maintain temperature or comply with the "water lines" draining requirement, and the parties do not contest that Plaintiff did drain the plumbing lines, I find as a matter of law that Plaintiff complied with the P-9 safeguard. As such, there is no reason to exam the remaining arguments regarding the maintenance of the temperature of the premises.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is denied, and

Plaintiff's motion for summary judgment is granted with respect to liability.


**SO ORDERED.**


                                                    _____/s/_____
                                                    Steven L. Tiscione
                                                    United States Magistrate Judge
                                                    Eastern District of New York

Dated: Central Islip, New York
       March 24, 2022